Positive
As of: March 13, 2024 7:35 PM Z

## *Tartt v. City of Clarksville*

United States Court of Appeals for the Sixth Circuit

September 13, 2005, Filed

File Name: 05a0790n.06

Case No. 04-5925

**Reporter**

149 Fed. Appx. 456 *; 2005 U.S. App. LEXIS 19726 **; 2005 FED App. 0790N (6th Cir.)

KARL VINCENT TARTT, Plaintiff-Appellant, v. CITY OF CLARKSVILLE, and LAVOYED HUDGINS, Defendants-Appellees.

**Notice: [**1]** CONSULT 6TH CIR. R. 32.1 FOR CITATION OF UNPUBLISHED OPINIONS AND DECISIONS.

**Prior History:** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE.

## Core Terms

re-hire, resignation, similarly situated, prima facie case, district court, summary judgment, disciplinary, proffered, disciplinary problem, employees, reasons, discrimination claim, sufficient evidence, terminated

## Case Summary

**Procedural Posture**

Plaintiff employee sued defendants, the City of Clarksville (Tennessee) and the City's police chief, alleging that they violated Title VII of the Civil Rights Act, *42 U.S.C.S. § 2000e et seq.*, the Tennessee Human Rights Act, *Tenn. Code Ann. § 4-21-401*, and *42 U.S.C.S. § 1981* when they refused to rehire him. The U.S. District Court for the Middle District of Tennessee granted defendants' motion for summary judgment, and the employee appealed.

**Overview**

The employee, an African-American, claimed that he was terminated from his job as a police officer and that the City's police chief refused to hire him because of his race. The district court found that the employee presented enough evidence to make a prima facie case of racial discrimination but did not present enough evidence to rebut the legitimate, nondiscriminatory reason the City offered for refusing to rehire him, namely, his record of disciplinary and personal problems, and it dismissed his complaint. The court of appeals found that the employee failed to present evidence that he was treated less favorably than similarly situated non-minority employees and disagreed with the district court's conclusion that the employee made a prima facie case of racial discrimination; however, it agreed with the district court's conclusion that the employee failed to show that the reason the City gave for its decision not to rehire the employee was pretextual. The court also held that, by failing to address his claims that the City and the police chief violated his rights under *42 U.S.C.S. § 1981* and the THRA in his appellate brief, the employee waived those claims.

**Outcome**

The district court's judgment was affirmed.

## LexisNexis® Headnotes

Civil Procedure > ... > Discovery > Methods of Discovery > General Overview

Civil Procedure > Judgments > Summary Judgment > General Overview

Civil Procedure > ... > Summary Judgment > Appellate Review > General Overview

Civil Procedure > ... > Summary Judgment > Appellate Review > Standards of Review

Civil Procedure > ... > Summary Judgment > Opposing Materials > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Supporting Materials > General Overview

Civil Procedure > ... > Summary Judgment > Supporting Materials > Discovery Materials

Civil Procedure > Appeals > Standards of Review > De Novo Review

*HN1*[⬇] **Discovery, Methods of Discovery**

The U.S. Court of Appeals for the Sixth Circuit reviews de novo a district court's order granting summary judgment. Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show there is no genuine issue as to any material facts and that the moving party is entitled to judgment as a matter of law. All ambiguities and inferences to be drawn from the facts should be resolved in favor of the party opposing summary judgment, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party.

Governments > Legislation > Statute of Limitations > Time Limitations

Labor & Employment Law > ... > US Equal Employment Opportunity Commission > Civil Actions > Deferral

Governments > Legislation > Statute of Limitations > General Overview

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

Labor & Employment Law > ... > Title VII Discrimination > Statute of Limitations > Waiver

Labor & Employment Law > ... > Civil Actions > Time Limitations > General Overview

*HN2*[⬇] **Statute of Limitations, Time Limitations**

Tennessee is a deferral state for purposes of federal discrimination statutes. *Tenn. Code Ann. § 4-21-101*. In a deferral state, when a plaintiff institutes state proceedings, he

must file his charge with the U.S. Equal Employment Opportunity Commission within 300 days of the alleged discrimination. *42 U.S.C.S. § 2000e-5(e)(1)*. While the 300-day bar is not jurisdictional, it does have the effect of a statute of limitations, and is not to be waived without good cause.

Civil Procedure > ... > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview

Labor & Employment Law > ... > US Equal Employment Opportunity Commission > Civil Actions > General Overview

Civil Procedure > ... > Jurisdiction > Subject Matter Jurisdiction > General Overview

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

*HN3*[⬇] **Subject Matter Jurisdiction, Jurisdiction Over Actions**

Federal courts do not have subject matter jurisdiction to hear claims under Title VII of the Civil Rights Act of 1964 unless the claimant files the claim in an Equal Employment Opportunity Commission (EEOC) charge or the claim can be reasonably expected to grow out of an EEOC charge. The judicial complaint must be limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination.

Labor & Employment Law > ... > Evidence > Burdens of Proof > Burden Shifting

Civil Rights Law > ... > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Protected Classes

Governments > Legislation > Statute of Limitations > General Overview

Governments > Legislation > Statute of Limitations > Time Limitations

Labor & Employment Law > Affirmative Action > General Overview

Labor & Employment Law > Discrimination > Actionable Discrimination

Labor & Employment
Law > Discrimination > Reconstruction Statutes

Labor & Employment Law > Discrimination > Title VII
Discrimination > General Overview

*HN4*[⬇] **Burdens of Proof, Burden Shifting**

Title VII of the Civil Rights Act of 1964 prohibits
discrimination by an employer against any individual on the
basis of race, color, religion, sex, or national origin. *42
U.S.C.S. § 2000e-2(a)*. The framework for analyzing a Title
VII claim was established by the U.S. Supreme Court in
McDonnell Douglas Corp. v. Green. Claims under *42
U.S.C.S. § 1981* and the Tennessee Human Rights Act
(THRA) are analyzed in the same manner as claims under
Title VII. However, claims under *42 U.S.C.S. § 1981* and the
THRA are not governed by the same Equal Employment
Opportunity Commission restrictions and statutes of
limitations as Title VII claims.

Labor & Employment Law > ... > Evidence > Burdens of
Proof > Employee Burdens of Proof

Evidence > Burdens of Proof > General Overview

Evidence > Burdens of Proof > Initial Burden of
Persuasion

Labor & Employment Law > Discrimination > General
Overview

Labor & Employment Law > Discrimination > Racial
Discrimination > General Overview

Labor & Employment Law > ... > Racial
Discrimination > Employment Practices > Failures to
Hire

Labor & Employment Law > ... > Evidence > Burdens of
Proof > General Overview

Labor & Employment Law > ... > Racial
Discrimination > Remedies > General Overview

Labor & Employment Law > Discrimination > Title VII
Discrimination > General Overview

*HN5*[⬇] **Burdens of Proof, Employee Burdens of Proof**

A plaintiff bears the initial burden of establishing a prima
facie case of racial discrimination under Title VII of the Civil

Rights Act of 1964, by a preponderance of the evidence. To
establish a prima facie case of racial discrimination, a plaintiff
must show that: (1) he is a member of a protected class; (2) he
suffered an adverse employment action; (3) he was qualified
for the position in question; and (4) he was treated less
favorably than similarly situated nonprotected employees.

Evidence > Burdens of Proof > General Overview

Labor & Employment
Law > Discrimination > Actionable Discrimination

Labor & Employment Law > ... > Disparate
Treatment > Employment Practices > General Overview

*HN6*[⬇] **Evidence, Burdens of Proof**

In Mitchell v. Toledo Hosp., the U.S. Court of Appeals for the
Sixth Circuit set out the standard for evaluating whether a
protected plaintiff is similarly situated to nonprotected
employees. To make a comparison of discrimination between
a plaintiff's treatment to that of non-minority employees, the
plaintiff must show that the comparables are similarly situated
in all respects. To be deemed similarly situated, the
individuals with whom the plaintiff seeks to compare his or
her treatment must have dealt with the same supervisor, have
been subject to the same standards, and have engaged in the
same conduct without such differentiating or mitigating
circumstances that would distinguish their conduct or the
employer's treatment of them for it.

Evidence > Burdens of Proof > General Overview

Labor & Employment Law > ... > Evidence > Burdens of
Proof > Burden Shifting

*HN7*[⬇] **Evidence, Burdens of Proof**

To survive a motion for summary judgment after an employer
has articulated a legitimate, nondiscriminatory reason for its
actions, a plaintiff must produce sufficient evidence from
which the jury may reasonably reject the employer's
explanation. The plaintiff must show by a preponderance of
the evidence either (1) that the proffered reasons had no basis
in fact, (2) that the proffered reasons did not actually motivate
his discharge, or (3) that they were insufficient to motivate
discharge.

Labor & Employment

Law > Discrimination > Actionable Discrimination

Labor & Employment Law > ... > Disparate Treatment > Employment Practices > General Overview

### HN8[↓] Discrimination, Actionable Discrimination

In order to show that an employer's proffered nondiscriminatory explanation is pretext on the grounds that a similarly situated employee received disparate treatment for the same conduct, the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the relevant aspects.

Civil Procedure > ... > Summary Judgment > Supporting Materials > Memoranda of Law

Governments > Legislation > Statute of Limitations > Time Limitations

Labor & Employment Law > ... > Racial Discrimination > Employment Practices > Failures to Hire

Civil Procedure > Pleading & Practice > Motion Practice > General Overview

Civil Procedure > Pleading & Practice > Motion Practice > Opposing Memoranda

Civil Rights Law > Protection of Rights > Procedural Matters > Statute of Limitations

Governments > Legislation > Statute of Limitations > General Overview

Labor & Employment Law > Discrimination > Actionable Discrimination

Labor & Employment Law > Discrimination > Racial Discrimination > Statute of Limitations

Labor & Employment Law > Discrimination > Reconstruction Statutes

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

### HN9[↓] Supporting Materials, Memoranda of Law

An employee's claims under *42 U.S.C.S. § 1981* and the Tennessee Human Rights Act (THRA) are analyzed under the same framework as a claim under Title VII of the Civil Rights Act of 1964. However, claims under *42 U.S.C.S. § 1981* and the THRA are not subject to the same 300-day statute of limitations and Equal Employment Opportunity Commission-charge restrictions as Title VII claims. Claims under *42 U.S.C.S. § 1981* claim are subject to a four-year statute of limitations, and claims under the THRA must be made within one year of the date on which the alleged discriminatory practice ceased. *Tenn. Code Ann. § 4-21-311(d)*.

**Counsel:** For KARL VINCENT TARTT, Plaintiff - Appellant: Andy L. Allman, Kelly, Kelly & Allman, Hendersonville, TN.

For CITY OF CLARKSVILLE, Defendant - Appellee: David Haines, City Attorney, Clarksville, TN.

For V. LAVOYED HUDGINS, Defendant - Appellee: David Haines, City Attorney, Clarksville, TN.

**Judges:** BEFORE: BOGGS, Chief Judge; BATCHELDER and GIBBONS, Circuit Judges.

**Opinion by:** ALICE M. BATCHELDER

# Opinion

 [*457] **ALICE M. BATCHELDER, Circuit Judge.** Plaintiff-Appellant Karl Tartt, a black man and former police officer, appeals the district court's grant of summary judgment to Defendants-Appellees City of Clarksville and Police Chief Lavoyed Hudgins [*458] (collectively, "Clarksville"), dismissing Tartt's claims of employment discrimination based on his race in violation of *42 U.S.C. § 2000e* [**2] ("Title VII"), the Tennessee Human Rights Act, *T.C.A. § 4-21-401 (a)(1)* ("THRA"), and *42 U.S.C. § 1981* ("§ 1981"). Because Tartt failed to make out a prima facie case of discrimination, and because even if he did make out a prima facie case, he did not present sufficient evidence to show that it was his race--as opposed to his myriad disciplinary and personal problems--that prevented him from being re-hired, we affirm the judgment of the district court.

## BACKGROUND

Tartt was hired by the Clarksville Police Department ("CPD") on June 1, 1998. Over the following three years, he was the subject of numerous disciplinary actions by CPD. On December 4, 1998, Tartt was arrested for child abuse, for which he was placed on administrative leave. The charges were dismissed in March 1999 and, after an investigation

determining that Tartt had not violated any departmental policies, CPD reinstated him on May 17, 1999. On October 8, 1999, Tartt's neighbor filed a complaint against him for "conduct perceived to be improper while off duty." CPD investigated the charges and concluded that no departmental policy had been violated. On or about [**3] September 1, 2000, Tartt admitted to his supervisor that he had used his patrol car while off duty in violation of CPD rules, for which he received counseling. Two weeks later Tartt again violated CPD rules by transporting his son in his police vehicle, for which he received a two-day suspension. On or about May 21, 2000, Tartt made an arrest and seized a quantity of marijuana and $ 130 cash. Tartt failed to turn the cash in to CPD as evidence, and was given a verbal reprimand. On October 8, Tartt again used his patrol car to transport a family member, for which he once again received counseling. On December 12, 2000, Tartt was given a "counseling report" for going to his off-duty job at Wal-Mart, clocking in, and then leaving to work another job at the Santa Fe Restaurant. Tartt was cited for "conduct . . . unbecoming an officer and bringing disrepute upon the Police Department." On January 31, 2001, Tartt received a reprimand for being late to roll call, although he disputes that he was actually late.

Tartt's most significant disciplinary action involved a complaint filed against him by Marilu Armstrong on February 10, 2001, alleging that on February 7, 2001, Tartt pulled his gun [**4] and shot at Armstrong's dog while Armstrong's young daughter was standing next to the dog. Sergeant Phillip Ashby conducted an internal investigation of this incident, and determined that Tartt had violated departmental rules for Neglect of Duty when "he failed to back away from a vicious dog tied by a cord, fired his weapon in close proximity to Armstrong and her daughter[,] . . . failed to think of the safety of the fifteen children in the neighborhood when he fired his weapon[,] . . . [and] failed to try other options before he fired his weapon." As a result of the investigation, Ashby recommended to Chief Hudgins that he dismiss Tartt from his duties. Hudgins agreed with Ashby's conclusions and began the process of terminating Tartt's employment. Tartt was placed on administrative leave effective March 1, 2001, because of the pending disciplinary action, and on March 6, 2001, Tartt submitted a letter of resignation. Tartt argues on appeal that he was given the option of resigning in lieu of having a termination appear on his record, but Clarksville contends that Tartt resigned for personal reasons, including that his wife was "running around on [*459] him." [1]

[**5] Tartt was dealing with marital difficulties at the time of his resignation. On March 20, 2001, two weeks after resigning, Tartt petitioned the Montgomery County General Sessions Court for an Order of Protection directed at his wife, Sondra. Tartt claimed that Sondra had assaulted him on March 15, 2001, and that she had done so on other occasions in the past. Tartt asked that Sondra be prohibited from "stalking him." On April 19, 2001, CPD officers responded to a domestic assault call at Tartt's home, and arrested both Tartt and his wife for assault.

In June 2001, Tartt met with Hudgins to request that he be re-hired. Tartt claims that during this meeting he was told that it was "policy" for officers who leave the CPD to wait one year before being eligible for re-hire. Hudgins disputes saying this, and Clarksville admits that no such official policy exists at CPD. Hudgins claims that if he did make such a statement, it would have been in the context of the significant personal and disciplinary problems Tartt would have to surmount in order to be re-hired.

On January 7, 2002, Tartt filed a complaint with both the EEOC and the Tennessee Human Rights Commission ("THRC"), in which he [**6] claimed he was discriminated against because of his race when the CPD refused to re-hire him. In this complaint Tartt claims that the discrimination began on June 21, 2001--the date on which Hudgins allegedly told him of the one-year policy for re-hire--and continued thereafter. On May 3, 2002, the EEOC sent Tartt a notice of his right to sue, advising that it was dismissing his charge because, based on its investigation, it was unable to conclude that discrimination had taken place. Tartt filed his complaint in this case on July 25, 2002, and filed an amended complaint on September 27, 2002.

In granting summary judgment to Clarksville, the district court found that Tartt had put forth sufficient evidence to make out a prima facie case of race discrimination under *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*, and its progeny. Noting that Clarksville conceded that Tartt had established the first three elements of his prima facie case, the district court assumed, for purposes of summary judgment, that Tartt had created a genuine dispute of material fact as to the fourth element--whether he was treated less favorably with regard to his request to be re-hired [**7] than similarly situated white officers at CPD. The district court found, however, that Tartt had not presented sufficient evidence to rebut the legitimate non-discriminatory reason proffered by Clarksville for CPD's refusing to re-hire him--his significant disciplinary and

---

[1] Tartt alleges in his complaint that on March 6, 2001, he "quit for personal reasons." Nonetheless, the record indicates that Chief Hudgins drafted a letter dated February 26, 2001, in which he indicated that he was terminating Tartt's employment. Whether this letter was ever delivered to Tartt is in dispute, but the letter does lend some credence to Tartt's claim that he was constructively discharged from his job.

personal problems--and dismissed his complaint.

## ANALYSIS

### I. Standard of Review

*HN1*[↑] We review de novo a district court's order granting summary judgment. *Smith v. Ameritech, 129 F.3d 857, 863 (6th Cir. 1997)*. Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show [*460] there is no genuine issue as to any material facts and that the moving party is entitled to judgment as a matter of law. *Id.* All ambiguities and inferences to be drawn from the facts should be resolved in favor of the party opposing summary judgment, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party. *Celotex Corp. v. Catrett, 477 U.S. 317, 330 n.2, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*.

### II. Title VII Claim

#### A. Time Period for Examining Discrimination

Tartt's argument [**8] that CPD discriminated against him in its refusal to re-hire him three months after his resignation often morphs into an argument that he (like black officers generally) was discriminated against by CPD during his tenure with the department, that is, before the department's refusal to re-hire him, and that such discrimination contributed to his being forced to resign in March 2001. Tartt is barred, however, from bringing Title VII discrimination claims for incidents prior to CPD's refusal to re-hire him, for two reasons.

First, such claims are untimely. *HN2*[↑] Tennessee is a "deferral state" for purposes of the federal discrimination statutes. *Weigel v. Baptist Hosp. of E. Tenn., 302 F.3d 367, 375-76 (6th Cir. 2002)*; *Jackson v. Richards Med. Co., 961 F.2d 575, 578-79 (6th Cir. 1992)*; *see T.C.A. § 4-21-101*. In a deferral state, when a plaintiff institutes the relevant state proceedings, as Tartt did with his THRC complaint, he must file his EEOC charge within 300 days of the alleged discrimination. *42 U.S.C. § 2000e-5(e)(1)*; *see Weigel, 302 F.3d at 375-76* (applying 300-day bar to [**9] ADEA claim); *Jackson, 961 F.2d at 578-79* (same); *Lawton v. State Mut. Life Assur. Co. of America, 101 F.3d 218, 221 (1st Cir. 1996)* (applying 300-day bar in Title VII context in deferral state of Massachusetts); *Pikulin v. City Univ. of N. Y., 176 F.3d 598,*

*599-600 (2d Cir. 1999)* (applying 300-day bar in Title VII context in deferral state of New York); *see also AMTRAK v. Morgan, 536 U.S. 101, 114, 153 L. Ed. 2d 106, 122 S. Ct. 2061 (2002)* (holding that a Title VII plaintiff alleging a discrete act of discrimination, who files a grievance with the appropriate state agency, must file his EEOC charge within 300 days of the alleged act). While the 300-day bar is not jurisdictional, it does have the effect of a statute of limitations, and is not to be waived without good cause. *Weigel, 302 F.3d at 376*. Tartt did not file his EEOC charge until January 7, 2002, more than 300 days after his March 6, 2001, resignation from CPD. Thus, the 300-day bar prevents Tartt from claiming discrimination for acts prior to his resignation, which limits him to his claims of discrimination regarding his attempt to be re-hired in June 2001 (which was [**10] within 300 days of his January 7, 2002, EEOC filing).

Second, even if Tartt had filed his EEOC charge early enough to capture events prior to his request to be re-hired, he would still be barred from pursuing such claims by the narrow scope of the discrimination claimed in his EEOC charge. Tartt's EEOC charge claims only discrimination in CPD's refusal to re-hire him, and alleges the earliest date of discrimination as June 21, 2001, (the date on which Hudgins allegedly told Tartt that he had to wait at least one year for re-hire). "It is well settled that *HN3*[↑] federal courts do not have subject matter jurisdiction to hear Title VII claims unless the claimant explicitly files the claim in an EEOC charge or the claim can be reasonably expected to grow out of the EEOC charge." *Weigel, 302 F.3d at 379* (internal [*461] quotation omitted). The "judicial complaint must be limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination." *Id. at 380* (internal quotation omitted). An investigation of Tartt's claims of discrimination in the terms and conditions of his employment would not be "reasonably expected to grow out [**11] of the EEOC's investigation of CPD's refusal to re-hire Tartt; therefore, because the EEOC has not had the opportunity to investigate Tartt's pre-resignation claims, we lack subject matter jurisdiction to entertain them.

#### B. Prima Facie Case

*HN4*[↑] Title VII prohibits discrimination by an employer against any individual on the basis of race, color, religion, sex, or national origin. *42 U.S.C. § 2000e-2(a)*. The framework for analyzing a Title VII claim was established by the Supreme Court in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*. *Section 1981* and THRA claims are analyzed in the same manner as

claims under Title VII. [2] *Patterson v. McLean Credit Union*, 491 U.S. 164, 185-88, 105 L. Ed. 2d 132, 109 S. Ct. 2363 (1989), *overruled on other grounds as recognized in*, Hamilton v. City of Martin, 1997 U.S. App. LEXIS 32297, No. 96-5651, 1997 WL 720479, at *3 (6th Cir. Nov. 12, 1997); Harper v. BP Exploration & Oil Co., 896 F. Supp. 743, 747 (M.D. Tenn. 1995), *aff'd*, 134 F.3d 371 (6th Cir. 1998); Campbell v. Fla. Steel Corp., 919 S.W.2d 26, 31 (Tenn. 1996).

[**12] HN5[↑]] A plaintiff bears the initial burden of establishing a prima facie case of racial discrimination under Title VII by a preponderance of the evidence. *McDonnell Douglas, 411 U.S. at 802.* To establish a prima facie case of racial discrimination, the plaintiff must show that: 1) he is a member of a protected class; 2) he suffered an adverse employment action; 3) he was qualified for the position in question; and 4) he was treated less favorably than similarly situated non-protected employees. *See Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir. 1992).* The parties agree that Tartt has established the first three elements of this test, but Clarksville contends that Tartt is unable to show that in its refusal to re-hire him three months after the termination of his employment, CPD treated Tartt less favorably than similarly situated non-protected employees. The district court assumed, for purposes of summary judgment, that Tartt had created a genuine issue of material fact as to whether he was treated less favorably than similarly situated white officers.

In his brief on appeal, Tartt does not compare himself to white officers who resigned and sought [**13] re-hire. Nonetheless, we have reviewed Clarksville's brief, the district court opinion, and the record, and it appears that at some point Tartt identified eight white officers who resigned and were re-hired within a year: Phil Ashby, Elaina Back, Larry Boren, Richard Brown, Mike Davis, Judy Keim, Jason Wright, and Kelly Darland. None of these officers, however, was similarly situated to Tartt.

HN6[↑]] In *Mitchell,* we set out the standard for evaluating whether a protected plaintiff is similarly situated to the proffered non-protected employees:

> It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the "comparables" are similarly situated *in all respects.* Thus, to be deemed "similarly situated," the individuals with [*462] whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have

been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

964 F.2d at 583 (internal citations omitted). [**14] Therefore, for purposes of Tartt's re-hiring discrimination claim, to be similarly situated to Tartt a white officer would have to have resigned with a spotty disciplinary record and been re-hired by Chief Hudgins within one year. [3] None of the eight proffered white employees meets this standard.

Elaina Back is the only one of these officers who resigned and was re-hired within one year by Chief Hudgins. Back, however, had a spotless disciplinary record, and only resigned in the first place for personal reasons having [**15] nothing to do with her job at CPD. Jason Wright resigned and more than a year later, was re-hired by Hudgins, but there is no evidence that Wright ever had any disciplinary problems. Ashby and Brown are the only two of the eight who were re-hired despite significant disciplinary problems in their pasts, but their disciplinary problems were not as pervasive as Tartt's. Moreover, Ashby was re-hired by a different police chief (Rossen) in 1995, six years before Tartt's resignation; and Brown was re-hired by yet another police chief (Slayden) in 1989, twelve years before Tartt's resignation and nearly two years after his own resignation. *See id.* (requiring, among other things, same supervisors for employees to be similarly situated). Therefore, Tartt has failed entirely to present evidence that he was treated less favorably than similarly situated employees. We disagree with the district court's assumption that Tartt made out a prima facie case of racial discrimination.

## C. Pretext

The district court held that, although it was assuming that Tartt had made out a prima facie case of discrimination, he failed to refute Clarksville's proffered non-discriminatory reason for refusing [**16] to re-hire him within one year-- namely, his numerous personal and disciplinary problems. We agree that, even if Tartt could make out a prima facie case of discrimination, he has failed to show that Clarksville's

---

[2] Section 1981 and THRA claims are not governed by the same EEOC restrictions and statutes of limitations as Title VII claims, however. We address this *infra* at Section II.

---

[3] In formulating this standard, it is important to note that there is no indication in the record that Hudgins told Tartt that he could never again work at CPD. In fact, Hudgins claims that he wanted Tartt to take a longer period of time off to get his life straightened out, and that then he could perhaps come back to work at CPD. Since Tartt claims that Hudgins told him that he could not be re-hired for at least a year, we use this time period for purposes of the similarly situated analysis.

149 Fed. Appx. 456, *462; 2005 U.S. App. LEXIS 19726, **16

proffered non-discriminatory reason for not re-hiring him was pretextual.

HN7[↑] To survive a motion for summary judgment after the employer has articulated a legitimate, non-discriminatory reason for its actions, "the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1083 (6th Cir. 1994)*. The plaintiff must "show by a preponderance of the evidence either (1) that the proffered reasons had no basis *in fact,* (2) that the proffered reasons did not *actually* motivate his discharge, or (3) that they were *insufficient* to motivate discharge." *Id. at 1084* (internal quotation omitted).

Tartt has not made any of these showings. First, it is undisputed that Tartt had the proffered disciplinary and personal **[*463]** problems. Second, Tartt has put forth no evidence to show that Chief Hudgins was not actually motivated by Tartt's personal and **[**17]** disciplinary problems in his decision not to re-hire him a mere three months after Tartt's employment terminated. Even if we consider the intermittent acts of discrimination that Tartt cites in the CPD over a twenty-year period, none of this evidence touches upon Chief Hudgins. In fact, Tartt's own brief indicates that Hudgins hired two black officers, one Asian officer, and one Hispanic officer during the very time period in 2001 when Tartt claims that Hudgins refused to re-hire him because he discriminated against black people. [4] And finally, Tartt's numerous personal and disciplinary problems were clearly sufficient to justify his not being re-hired a mere three months after his employment terminated. Therefore, the district court properly found that Tartt failed to put forth sufficient evidence of pretext. [5]

### **[**18] III. Section 1981 and THRA Claims**

As noted *supra* in Section II.B, HN9[↑] Tartt's *§ 1981* and THRA claims are analyzed under the same framework as his

Title VII claim; thus, because Tartt's claims of discrimination in refusal to re-hire fail under Title VII, they also fail under *§ 1981* and the THRA. But since *§ 1981* and THRA claims are not subject to the same 300-day statute of limitations [6] and EEOC-charge restrictions as Title VII claims, some of Tartt's arguments regarding racial discrimination at CPD prior to his termination might be considered under these statutes. The district court, therefore, should have distinguished Tartt's *§ 1981* and THRA claims from his Title VII claim. Tartt, however, fails even to mention either of these claims in his brief on appeal, much less to assign as error the district court's dismissing them, and our examination of the record below reveals that Tartt did not address either claim in his brief opposing Clarksville's motion for summary judgment. Tartt has therefore waived any appeal of his pre-termination *§ 1981* and THRA claims. *See Radvansky v. City of Olmsted Falls, 395 F.3d 291, 310-11 (6th Cir. 2005)* (treating an **[**19]** argument not raised in the appellate brief as waived for purposes of appeal).

### CONCLUSION

Accordingly, for the foregoing reasons, we **AFFIRM** the judgment of the district court.

End of Document

---

[4] Hudgins's tenure as police chief lasted from June 1, 1998, to December 31, 2001.

[5] Tartt's case for pretext is also weakened by his inability to show that similarly situated non-protected officers were treated more favorably than he was, and his attempt to compare himself to new hires must be rejected. *See Weigel, 302 F.3d at 378* HN8[↑] ("In order to show that an employer's proffered nondiscriminatory explanation is pretext on the grounds that a similarly situated employee received disparate treatment for the same conduct, the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the relevant aspects.") (italics and internal quotation omitted).

---

[6] Tartt's *§ 1981* claim is subject to a four-year statute of limitations, *see Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 382, 158 L. Ed. 2d 645, 124 S. Ct. 1836 (2004)*, while his THRA claim must be made "one (1) year after the alleged discriminatory practice ceases." *T.C.A. § 4-21-311(d)*.

 Neutral
As of: March 12, 2024 6:35 PM Z

# *Saade v. City of Detroit*

United States District Court for the Eastern District of Michigan, Southern Division

February 4, 2021, Decided; February 4, 2021, Filed

Case No. 19-cv-11440

**Reporter**
2021 U.S. Dist. LEXIS 21272 *; 2021 WL 391417

Alaa Saade, Plaintiff, v. The City of Detroit, Detroit Fire Department, Assistant Superintendent Sean Larkins, and Captain Timothy Goodman, in their official and individual capacity, Defendants.

**Prior History:** *Saade v. City of Detroit, 2019 U.S. Dist. LEXIS 187749, 2019 WL 5586970 ( E.D. Mich., Oct. 30, 2019)*

## Core Terms

accommodation, discipline, allegations, summary judgment motion, national origin, religion, argues, prima facie case, adverse employment action, discriminated, suspension, employees, paramedic, reasons, discrimination claim, night shift, disciplinary, candidate, promotion

**Counsel:** **[*1]** For Alaa Saade, Plaintiff: Amy V. Doukoure, Council on American Islamic Relations-Michigan, Farmington Hills, MI.

For City of Detroit, Defendant: LaKena T. Crespo, City of Detroit Law Department, Detroit, MI; Tiffany A. Boyd, Detroit, MI.

**Judges:** JUDITH E. LEVY, United States District Judge. Mag. Judge Mona K. Majzoub.

**Opinion by:** JUDITH E. LEVY

## Opinion

### OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [31] AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [32]

Before the Court are Plaintiff and Defendants' cross-motions for summary judgment (ECF Nos. 31, 32.) Plaintiff Alaa Saade is a Lieutenant for the EMS Division of the Detroit Fire

Department, working as a paramedic. (ECF No. 31, PageID.215; ECF No. 32, PageID.1540.) He sued the City of Detroit and two of its employees, Sean Larkins and Earl Timothy Goodman, for employment discrimination based upon his national origin.[1] Defendant Larkins is a Superintendent of EMS. (ECF No. 32, PageID.1540.) Defendant Goodman was a Captain within EMS and was Plaintiff's shift captain from approximately January 2017 through April or May 2017. (ECF No. 31, PageID.216; ECF No. 32, PageID.1541.)

Plaintiff alleges Defendants discriminated against him based on his national **[*2]** origin, which is Middle Eastern Palestinian, and his religion, which is Muslim. (ECF No. 1, PageID.11) He sues all Defendants in a one-count complaint under *Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.* Plaintiff's complaint describes four incidents of alleged discrimination:

> 1. Failure to promote in 2016;
> 2. Unlawful discipline on February 26, 2017 and denial of his right to appeal;
> 3. Unlawful discipline on March 27, 2017 and denial of his right to appeal; and
> 4. Failure to accommodate a request for shift changes during Ramadan in spring of 2017.

(*See* ECF No. 1, PageID.11-12.)

For the reasons set forth below, the Court DENIES Plaintiff's motion for summary judgment and GRANTS Defendants' motion for summary judgment.

### I. Background

Plaintiff is a practicing Muslim man, who is of Middle Eastern and Palestinian descent. (ECF No. 1, PageID.4.) Plaintiff began working for Defendant City of Detroit as an

---

[1] Plaintiff's complaint originally included the Detroit Fire Department as a Defendant. (ECF No. 1.) The parties stipulated to dismissal of the Detroit Fire Department. (ECF No. 12.)

Emergency Medical Technician (EMT) in April 2014. (ECF No. 32, PageID.1540.) He attended and completed the Emergency Medical Services (EMS) training academy program and was promoted to the position of a paramedic with the City's EMS department in February 2016. (*Id.*)

When Plaintiff was hired, he **[*3]** notified Defendants of his status as a devout and practicing Muslim and was granted an accommodation to have a beard despite the Defendants' "no beard" requirement.[2] (ECF No. 31, PageID.215.) He also made his national origin as Palestinian known, since he openly discussed it, was asked questions by his co-workers about being Palestinian, and he often brought in traditional Palestinian food to share. (*Id.* at PageID.216.)

The background regarding the four incidents underlying Plaintiff's Title VII claims are set forth below.

### Failure to Promote

In 2016, Plaintiff applied for job that would have led to a promotion to the rank of Shift Supervisor Grade II. (ECF No. 31, PageID.224.) He states that he was selected from many other candidates to take a written test and participate in an oral interview. Plaintiff states that he was the only candidate with a college degree, which was listed as one of the preferred job requirements. He also alleges that he was the only candidate who was Muslim and of Palestinian national origin. (*Id.*) (ECF No. 1, PageID.8-9.) Plaintiff was not offered the position.

### February 17, 2017 Discipline

On February 17, 2017, Plaintiff was disciplined for missing a day of work. **[*4]** Plaintiff states that he missed work because his daughter was sick. (ECF No. 31, PageID.216-17.) The absence resulted in Plaintiff receiving a charge for "Failure to Notify of an Anticipated Absence." (ECF No. 32, PageID.1543.)

Following the initial charge hearing, Plaintiff was found guilty of the charge and issued a written reprimand as a result. (*Id.*)

### March 27, 2017 Discipline

On March 27, 2017, Plaintiff received a charge of discipline

---

for delaying a run. During that time period, the City of Detroit's EMS response times were an ongoing issue within the department. (ECF No. 32, PageID.1544.) When response times exceeded eight minutes, the run would be flagged and reviewed for compliance with EMS's policy to have an ambulance in motion within one minute of a call. (*Id.*)

At 6:42 am that morning while Plaintiff was on duty, a run came in for an attempted suicide. Before the paramedics were notified of the run, another employee, Jeff Gaglio, arrived early for work on his shift and relieved Plaintiff's partner Nataki Vickers. As Gaglio and Plaintiff (who was driving the ambulance) began pulling out into the driveway for the run, Plaintiff saw his shift relief, Chris Photiades, arrive at **[*5]** work. Plaintiff turned the ambulance around to switch with Phiotades. Phiotades and Gaglio then took the run, and arrived on the scene at 6:51 am—nine minutes after the run came in. (*Id.* at 1544-45.)

When the run was flagged for delay, Defendant Goodman assigned Plaintiff's supervisor, Lieutenant Darin Ross, to investigate. Ross concluded that Plaintiff was responsible for the delayed run after turning around the ambulance in order to go home. Of the four individuals involved in the run that morning, only two were interviewed, and only Plaintiff was disciplined. (ECF No. 31, PageID.219.) The recommended penalty was a six-hour suspension, which Plaintiff did not serve. (ECF No. 32-8, PageID.1695.) Plaintiff did not serve the six-hour suspension. (ECF No. 32, PageID.1555.)

### April 2017 Ramadan Accommodation Request

Plaintiff alleges that he was denied a religious accommodation in April 2017. Plaintiff requested an accommodation to allow him to work night shifts during the month of Ramadan, which began in May 2017.[3] (ECF No. 1, PageID.9.) His request came at the time that Defendants were in their quarterly bidding process for shift and duty station assignments, and, according to policy, assignments are granted **[*6]** on a first-come, first-served basis based on seniority. (*Id.*) (ECF No. 1, PageID.9.) Plaintiff's request was denied. Plaintiff states that he attempted to find a co-worker who was willing to trade shifts with him but was unable to. (ECF No. 31, PageID.223.) Plaintiff's request was later accommodated. (*See* ECF No. 32-3, PageID.1596-97.)

---

[2] The Court understands that this policy is related to the ability to properly seal a mask around one's nose and mouth, which a beard may interfere with.

[3] During Ramadan, Plaintiff would be unable to eat or drink from sunup to sundown, and—given the nature of the duties of a paramedic—he sought an accommodation to work a night shift so he would not be fasting during his shift. (ECF No. 31, PageID.223.)

2021 U.S. Dist. LEXIS 21272, *6

*Plaintiff's Injuries*

Plaintiff argues that he has suffered stress, anxiety, and emotional distress because of Defendants' conduct in the five incidents described above. He argues that he was penalized for taking time off work due to stress after these incidents, and then, when he returned, he was placed on probation.[4] He states that he spent almost eight months off work seeking treatment. Plaintiff also alleges that he suffered a loss in wages, seniority, overtime pay, and benefits due to the incidents alleged in his complaint.

*Equal Employment Opportunity Commission*

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC). The EEOC describes the charge as follows:

> The [Plaintiff] alleges he was disciplined on February 26, 2017 and March 27, 2017, denied promotion to the position of Assistant Emergency Medical Service [*7] Supervisor-Grade II in March 2017 due to his national origin, Palestinian, and religion, Muslim, and that he was denied a religious accommodation of a shift assignment change on April 10, 2017 due to his religion in violation of Title VII.

(ECF No. 1-2, PageID.17.) After investigating the allegations, the EEOC concluded the following:

> The Commission's investigation did establish that [Plaintiff] was discriminated against on March 27, 2017, when he was disciplined due to his national origin and religion in violation of Title VII. There was insufficient evidence to support a violation of Title VII with respect to the remaining allegations and the [Plaintiff] will receive a Dismissal and Notice of Rights regarding these allegations.

(ECF 34-3, PageID.2285.)

In sum, the EEOC found that Plaintiff was discriminated against due to his national origin and religion for one of the four charges brought: the March 27, 2017 discipline. Plaintiff received a right to sue letter for the remaining three charges: failure to promote, the February 27, 2017 discipline, and April 2017 religious accommodation denial.

**II. Legal Standard**

Summary judgment is proper when "the movant shows that there is no genuine [*8] dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co., 95 F. App'x 132, 135 (6th Cir. 2004)* (citing *Skousen v. Brighton High Sch., 305 F.3d 520, 526 (6th Cir. 2002))*.

**III. Analysis**

**A. EEOC Exhaustion**

As an initial matter, Defendants argue that the Court does not have subject matter jurisdiction to hear any of Plaintiff's claims beyond those explicitly raised with the EEOC. Defendants are correct. "It is well settled that federal courts do not have subject matter jurisdiction to hear Title VII claims unless the claimant explicitly files the claim in an EEOC charge or the claim can be reasonably expected to grow out of the EEOC charge." *Strouss v. Mich. Dept. of Corr., 250 F.3d 336, 342 (6th Cir. 2001)*.

Plaintiff's EEOC charge of discrimination is set forth above. His complaint cites to four incidents of alleged discrimination: (1) failure to promote Plaintiff in 2016; (2) discipline on February 26, 2017 and denial of appellate rights; (3) a second discipline incident on March 27, 2017 and denial of appellate rights; (4) failing to [*9] provide a reasonable religious accommodation that would enable him to work a night shift during the month of Ramadan. (ECF No. 1, PageID.11-12.)

These four incidents match the claims that Plaintiff brought before the EEOC, except for the allegations that Plaintiff was denied his appellate rights for the February and March 2017 incidents. Accordingly, those will not be considered. Further, it appears from Defendants motion that through the course of discovery, the scope of Plaintiff's claims may have expanded to include additional incidents. The Court will only consider the claims that were brought before the EEOC.[5]

---

[4] For the reasons set forth below, this claim will not be addressed because Plaintiff did not exhaust it.

[5] In Plaintiff's reply brief, he appears—for the first time—to set forth ***hostile work environment*** claims. However, these will not be considered because they were not presented to the EEOC, and, additionally, the Court need not address arguments raised for the first

## B. Title VII Generally

Under Title VII, an employer is prohibited from discriminating against any individual "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *42 U.S.C. § 2000e—2(a)(1)*. The plaintiff has the burden of proving the defendant's discrimination in a Title VII case. *See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*. Also, in this particular case the parties do not dispute that there is no direct evidence of discrimination.

When setting forth a prima facie case based upon circumstantial evidence, a plaintiff must show that: [*10] (1) they are a member of a protected class;[6] (2) they were subject to an adverse employment action; (3) they were otherwise qualified; and (4) they were treated less favorably than a similarly situated employees outside of the protected class. *Hall v. Baptist Mem'l Health Care Corp., 215 F.3d 618, 626 (6th Cir. 2000)*.[7]

First, the Court will address the Title VII claims brought against the individual Defendants. Second, the Court will analyze Plaintiff's discrimination claims against the City of Detroit.

## C. Individual Claims Against Defendants Larkins and Goodman

Plaintiff sues both Defendants Larkins and Goodman in their individual and official capacities. As to the suit against them in their individual capacities, the Sixth Circuit has long held that Title VII does not contemplate liability against other individual employees even if that employee is a supervisor. "[A]n individual employee/supervisor, who does not

---

time in a reply brief. *See Scottsdale Ins. Co. v. Flowers, 513 F.3d 546, 553 (6th Cir. 2008)* ("[W]e have found issues to be waived when they are raised for the first time in motions requesting reconsideration or in replies to responses.")

[6] The parties do not dispute that Plaintiff is a member of a protected class based on his Muslim religion and Palestinian national origin.

[7] Once the plaintiff has established a prima facie case, then *McDonnel Douglas* burden shifting occurs, and the defendant must articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Hall, 215 F.3d at 626*. If the defendant does so, the burden shifts back to the plaintiff to prove that the reason advanced is pretextual. *Id.* However, as set forth below, Plaintiff does not establish a prima facie case for any of the incidents cited, and accordingly, the Court need not address burden shifting.

otherwise qualify as an 'employer,' may not be held personally liable under Title VII." *Wathen v. General Elec. Co., 115 F.3d 400, 405 (6th Cir. 1997)*. Rather, only an "employer" may be sued under Title VII. *42 U.S.C. § 2000e(b)*. Plaintiff has not made any arguments that either of these individuals are or were "employers" under Title VII. The facts indicate both are individual employees and supervisors employed [*11] by the City of Detroit. Accordingly, neither Larkins nor Goodwin can be sued under Title VII in their individual capacities and those claims are dismissed.

Plaintiff also sues Larkins and Goodwin in their official capacities. As to Defendant Larkins, Plaintiff's claims are dismissed because he does not set forth any specific allegations of discrimination. Plaintiff was asked in his deposition, "What action did Chief Larkins take against you that you would believe [was] discriminatory based on your religion or your ethnicity?" Plaintiff answered, "None. He did not take any." (ECF No. 32-3, PageID.1612.) A discriminatory act is an essential element of a discrimination claim under Title VII. Without it, Plaintiff's claims against Larkins fail and he is dismissed.

As to Defendant Goodwin, Plaintiff explains that Goodwin used Facebook to post dozens, if not hundreds, of items containing offensive, Islamophobic, racist, xenophobic, and humiliating images and comments. (ECF No. 31, PageID.220.) Plaintiff states that his co-workers alerted him to the postings in the spring of 2017, and that Plaintiff's co-workers were concerned that Defendant Goodman had put Plaintiff on a "mental hit list of [*12] minority EMS workers that [Goodman] was seeking to have terminated."[8] (*Id.*)

The Facebook posts are clearly offensive and Plaintiff may have justifiably felt unsafe being around Defendant Goodman as a result. However, the allegations related to Goodman do not meet the elements of a Title VII discrimination claim. Plaintiff does not set forth any evidence that Goodman was involved in the 2016 promotion decision. Nor did Goodman lead the investigations into the February 17, 2017 or March 27, 2017 disciplinary incidents and appeals.[9] Nor does

---

[8] After the City of Detroit became aware of the offensive Facebook posts, Defendant Goodman was investigated, charged, and terminated. (ECF No. 32, PageID.1542.) Defendant Goodman's union grieved his termination, and, after an arbitration, the arbitrator rendered an award reinstating him. (*Id.*)

[9] Plaintiff does argue that the "entire blame of the delayed run [on March 27, 2017] was placed squarely on the shoulders of Mr. Saade by Defendant Goodman." (ECF No. 34, PageID.2034.) But this argument is conclusory and not supported by the record. The investigation regarding the delay was handled by another supervisor,

Plaintiff set forth evidence that Goodwin was involved in his Ramadan scheduling accommodation. Accordingly, Plaintiff has not met his burden of establishing a prima facie Title VII case against Defendant Goodwin, and Goodwin is dismissed.

**D. Claims Against Defendant City of Detroit**

**1. Failure to Promote in 2016**

Plaintiff's first claim against the City of Detroit is that he was discriminated against when he was not hired for a position that would have led to a promotion to the rank of Shift Supervisor Grade II. (ECF No. 31, PageID.224.) For the purposes of Title VII, failure to promote is an adverse employment action. *See Hale v. Cuyahoga County Welfare Dep't, 891 F.2d 604, 606 (6th Cir. 1989).* Accordingly, Plaintiff **[*13]** must demonstrate he was otherwise qualified but treated less favorably than similarly situated employees. *Hall, 215 F.3d at 626.* Plaintiff does not meet his burden on this claim.

Defendants assert that Plaintiff did not meet all of the requirements for the position. (ECF No. 35, PageID.3128.) They also argue that Plaintiff "clearly lied on his application by indicating had been a paramedic with the Department for three (3) [...], when he had only been a paramedic for a couple months." (*Id.*) They also argue that the college degree was a preferred qualification, not a required qualification, and that Plaintiff has no evidence that the other applicants did not have this qualification. (*Id.*)

Plaintiff argues that he was qualified but was treated less favorably than similarly situated employees who are not members of the protected class—yet he does so only in conclusory terms and cites no evidence in support of his position. (*See* ECF No. 31, PageID.224, PageID.236.) He argues, without evidence, that he was the only candidate with a college degree. (*Id.*) Plaintiff admitted in his deposition that he was unsuccessful at the oral interview portion of the selection process. (*Id.*) Specifically, when asked if it was **[*14]** possible another candidate got the position because they outscored Plaintiff in other categories of the application, Plaintiff admitted, "I have no idea. Anything is possible." (ECF No. 32-3, PageID.1599.) Plaintiff was asked what evidence he had to support his claim of discrimination and he

stated, "I don't have any evidence of that. Just what I feel happened because of the way it happened, so." (*Id.*) This is not enough to sustain a claim of discrimination. Moreover, Plaintiff admitted that he provided false or incorrect information on his application regarding the length of time he had worked as an EMT. (*Id.* at PageID.1598.)

Rather than support his conclusory arguments with evidence, Plaintiff instead points to Defendants, arguing that they have not set forth legitimate reasons for passing over him for the position. (ECF No. 31, PageID.236.) But the burden does not shift to Defendants to provide legitimate reasons for their actions until Plaintiff has set forth a prima facie case under Title VII, which he has not.

In sum, Plaintiff has not established a prima facie case for failure to promote. Accordingly, Plaintiff's motion for summary judgment is denied, and the City's motion for **[*15]** summary judgment is granted on this claim.

**2. February 27, 2017 Discipline**

Plaintiff argues that the disciplinary action taken against him on February 27, 2020 was unlawful. Plaintiff argues that he called into work to report his absence by the time his shift began at 7:00 a.m. (*Id.*) Defendants argues he did not call in to report his absence, and that Defendants had to investigate the morning-of to discover why Plaintiff missed work. (ECF No. 32, PageID.1543.) Plaintiff received a letter of reprimand as a result of the investigation and charge. (ECF No. 32, PageID.1543.)

When establishing a prima facie case of discrimination, Plaintiff must demonstrate "a materially adverse change in the terms of [his] employment." *Chattman v. Toho Tenax America, Inc., 686 F.3d 339, 348 (6th Cir. 2012)* (citations omitted). Adverse employment actions are generally "tangible employment actions." *See Burlington Indus. v. Ellerth, 524 U.S. 742, 761, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998).* However, the Sixth Circuit has held that a "letter of reprimand is not a materially adverse employment action unless it is accompanied by a loss such as a demotion or salary reduction. . ." *Agrawal v. Montemagno, 574 F. App'x 570, 576-77 (6th Cir. 2014)* (citing *Taylor v. Geithner, 703 F.3d 328, 338 (6th Cir. 2013)).* Plaintiff has not demonstrated that there was any such accompanying demotion or salary reduction.

Accordingly, Plaintiff's claim that the February 2017 discipline was a violation **[*16]** of Title VII fails, and summary judgment is granted in favor of the City.

**3. March 27, 2017 Discipline**

---

Darin Ross. (*Id.*) Ross testified that the investigation was his own; not Goodman's. (ECF No. 32-12, PageID.1912.) While Plaintiff argues that Goodman may have desired a particular outcome of the investigation, neither Ross's testimony in his deposition, nor the legal arguments set forth by Plaintiff support these allegations justify sustaining a claim against Goodman on summary judgment.

Plaintiff's next claim regards his March 27, 2017 discipline for delaying a run. For this incident, Plaintiff was found guilty of Neglect of Duty and was issued a six-hour suspension and disciplinary letter. (ECF No. 32, PageID.1545.) Again, Plaintiff must establish that he suffered from a materially adverse employment action. *Chattman, 686 F.3d at 348.* Defendant argues, and Plaintiff does not refute, that Plaintiff "never served the six (6) hour suspension resulting from being found guilty of Neglect of Duty, did not suffer any loss of pay, nor any other damages from the suspension."[10] (ECF No. 32, PageID.1555.)

This leaves only a disciplinary letter in Plaintiff's personnel file. For the same reasons set forth above, this does not constitute a "material" adverse action. Accordingly, an unserved six-hour suspension and discipline letter are not sufficient to establish a materially adverse employment action. Therefore, Plaintiff has not established a prima facie case of discrimination for this claim.

Plaintiff focuses on the EEOC "cause" determination regarding the March 2017 disciplinary action.. The EEOC concluded: **[*17]** "The Commission's investigation did establish that [Plaintiff] was discriminated against no March 27, 2017, when he was disciplined due to his national origin and religion in violation of Title VII." (ECF No. 34-3, PageID.2285.) The EEOC does not provide a further explanation or reasoning for its finding.

The Court is not bound by this determination. *See Dorn v. General Motors Corp., 131 Fed. App'x 462, 471 (6th Cir. 2005)*. Moreover, an ***EEOC finding*** in Plaintiff's favor does not relieve Plaintiff of his burden of establishing a prima facie case, which he has not done here. *See Williams v. Nashville Network, 132 F.3d 1123, 1128-29 (6th Cir. 1997)*. Accordingly, the ***EEOC finding*** does not change the outcome here.

The Court considered the possibility that Plaintiff may be relying on the same arguments here that he made against Defendant Goodman, analyzed above. Specifically, Plaintiff alleged that Lt. Darin Ross led the investigation as directed by Defendant Goodman, and that accordingly it was no surprise that Ross found Plaintiff responsible for the delayed run. However, for reasons set forth above, Ross's testimony is

---

[10] Plaintiff argues that, around the same time period, a Caucasian Christian man, Mr. Borowski, was being assisted by Defendant Goodman in backdating FMLA paperwork to keep Borowski from being disciplined or terminated by the EMS unit. (ECF No. 31, PageID.217.) However, this argument is not developed beyond this conclusory allegation. And because Plaintiff has not demonstrated a materially adverse action, the Court need not reach the similarly situated treatment element.

clear that the investigation was his own.

**4. Ramadan 2017 Accommodation**

Finally, Plaintiff alleges that Defendant City of Detroit's failure to accommodate his request for a night shift during Ramadan was unlawful **[*18]** under Title VII. As set forth above, Plaintiff sought an accommodation for night shifts from May 28, 2017 through June 20, 2017. (ECF No. 32-14, PageID.1963.)

Yet, despite the allegation that Plaintiff was not accommodated, the records shows that he was, in fact, accommodated. In Plaintiff's deposition, he was asked whether he had made any accommodation requests from Defendant City of Detroit that were granted. He answered:

> 2017, I requested to be switched over to the night shift for the month of Ramadan. That one was granted after I put in for it, maybe three weeks prior to them granting it. The day it was approved was the day Captain Goodman's story was aired on the news.

(ECF No. 32-3, PageID.1596-97.) Additionally, Defendants' motion for summary judgment contains e-mail exhibits indicating that Plaintiff was granted accommodations during Ramadan in 2017. For example, on Wednesday May 17, 2017, Jason Bestard, the Administrative Lieutenant for the City of Detroit Fire Department EMS Division wrote to Plaintiff: "In order to accommodate your request, you will be moved to the NIGHTS 1 shift as a FLOAT PARAMEDIC for the dates, May 28 through June 20th. You will return to your regular shift **[*19]** Sunday, June 25th." (ECF No. 32-14, PageID.1961.) These dates covered the entire period for which Plaintiff sought an accommodation in his initial email to his supervisors.[11] (ECF No. 32-14, PageID.1963.)

There is no material question of fact for a jury to decide on this question. Indeed, all of the evidence presented indicates that Plaintiff was accommodated. Accordingly, he has not set forth a prima facie case on this claim. Plaintiff's motion for summary judgment is denied on this claim, and the City's motion is granted.

**IV. Conclusion**

For the reasons set forth above, the Court GRANTS

---

[11] Plaintiff argues that similarly situated white Christian employees were accommodated for their holidays when they were permitted to take breaks. (ECF No. 1, PageID.9.) However, the Court need not reach the similarly situated arguments, because Plaintiff has not established that he was denied accommodation.

2021 U.S. Dist. LEXIS 21272, *19

Defendants' motion for summary judgment and DENIES Plaintiff's motion for summary judgment. This case is dismissed with prejudice.

IT IS SO ORDERED.

Dated: February 4, 2021

Ann Arbor, Michigan

/s/ Judith E. Levy

JUDITH E. LEVY

United States District Judge

---

**End of Document**

 Neutral

As of: March 12, 2024 8:01 PM Z

## *Yerkes v. Ohio State Highway Patrol*

United States Court of Appeals for the Sixth Circuit

December 19, 2022, Filed

File Name: 22a0527n.06

Case No. 22-3030

**Reporter**

2022 U.S. App. LEXIS 35260 *; 2022 FED App. 0527N (6th Cir.); 2022 WL 17753528

STACEY ARNOLD YERKES, Plaintiff - Appellee, v. OHIO STATE HIGHWAY PATROL, et al., Defendants, GENE SMITH; MICHAEL KEMMER, WILLIAM STIDHAM; SCOTT WYCKHOUSE, Defendants - Appellants.

**Notice:** CONSULT *6TH CIR. R. 32.1* FOR CITATION OF UNPUBLISHED OPINIONS AND DECISIONS.

**Prior History: [*1]** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO.

*Yerkes v. Ohio State Highway Patrol, 2021 U.S. Dist. LEXIS 247838 (S.D. Ohio, Dec. 30, 2021)*

## Core Terms

tattoo, ***qualified immunity***, retaliation, district court, sex, sexual orientation, cases, constructive discharge, decisionmaker, foreseeable, terminated, adverse action, Defendants', discipline, adverse employment action, summary judgment, reporting, alleges

## Case Summary

### Overview

HOLDINGS: [1]-The district court erred in denying ***qualified immunity*** to defendants on plaintiff's sex ***discrimination*** claim under *42 U.S.C.S. § 1983* because the court's ***qualified immunity*** analysis contoured the right in question at too high a level of generality and the caselaw on the issue had gone in conflicting directions.

### Outcome

Judgment reversed.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

Civil Rights Law > ... > Immunity From Liability > Local Officials > Individual Capacity

**HN1**[ ] **Appellate Jurisdiction, Interlocutory Orders**

The appellate court has jurisdiction to review on interlocutory appeal a district court's denial of ***qualified immunity***. *28 U.S.C.S. § 1291*. However, this review is restricted: the appellate court can consider only purely legal questions. It cannot review disputed facts at this stage, or even exercise jurisdiction where the issue of ***qualified immunity*** turns on contested issues of fact. If the facts are disputed, as they often are, the court must presume the plaintiff's version of the facts. If an appeal challenges solely a district court's determination of evidence sufficiency, i.e., which facts a party may, or may not, be able to prove at trial, then it must be dismissed. There are only two exceptions to this rule. First, the appellate court may review appeals where the defendant, despite disputing a plaintiff's version of the story, concedes the most favorable view of the facts to the plaintiff for purposes of the appeal. Second, in the exceptional case, the court may review a challenge to the district court's factual determination if that determination is blatantly contradicted by the record, so that no reasonable jury could believe it.

Civil Procedure > Appeals > Standards of

Review > Questions of Fact & Law

**HN2**[ ] **Standards of Review, Questions of Fact & Law**

Even if a defendant in a partially fact-based appeal fails to meet either of the two exceptions, the court may separate the legal issues from the factual—i.e., it can still review pure questions of law, despite the defendant's failure to concede the plaintiff's version of the facts.

Civil Procedure > Appeals > Record on Appeal

**HN3**[ ] **Appeals, Record on Appeal**

The appellate court may exercise jurisdiction by ignoring a defendant's factual challenges, taking the facts in the record in the light most favorable to the plaintiff, and focusing on the purely legal issue at hand.

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

Torts > Public Entity Liability > Immunities > **_Qualified Immunity_**

Civil Procedure > ... > Summary Judgment > Appellate Review > Standards of Review

Civil Rights Law > ... > Immunity From Liability > Local Officials > Individual Capacity

**HN4**[ ] **Standards of Review, De Novo Review**

The appellate court reviews de novo a district court's denial of summary judgment regarding **_qualified immunity_**. **_Qualified immunity_** shields government officials from liability for damages for actions that do not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Thus, to defeat **_qualified immunity_**, a plaintiff must allege: (1) that the defendant violated a statutory or constitutional right and (2) that said right was clearly established at the time of the alleged violation. A right is clearly established where it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

Business & Corporate Compliance > ... > Disparate Treatment > Statutory Application > Reconstruction Statutes

Labor & Employment Law > ... > Disparate Treatment > Statutory Application > Reconstruction Statutes

Civil Rights Law > ... > Section **_1983_** Actions > Elements > Protected Rights

**HN5**[ ] **Statutory Application, Reconstruction Statutes**

In order to properly make out a claim under _42 U.S.C.S. § 1983_, a plaintiff must demonstrate that she has been deprived, by one acting under color of state law, of a right secured by the Constitution or Federal laws. _42 U.S.C.S. § 1983_. In general, the Sixth Circuit reviews constitutional **_discrimination_** claims alleging violation of Equal Protection under _§ 1983_ in a similar manner as Title VII **_discrimination_** claims, and looks at Title VII precedent in analyzing _§ 1983_ **_discrimination_** claims. In a _§ 1983_ **_discrimination_** case, the plaintiff must prove that the employer made an adverse employment decision with a discriminatory intent and purpose.

Governments > Legislation > Interpretation

**HN6**[ ] **Legislation, Interpretation**

The Supreme Court has repeatedly told courts not to define clearly established law at a high level of generality.

Torts > ... > Causation > Proximate Cause > Foreseeability of Harm

**HN7**[ ] **Proximate Cause, Foreseeability of Harm**

_42 U.S.C.S. § 1983_ should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions. Traditional tort concepts of causation inform the causation inquiry on a _§ 1983_ claim. Thus, courts have long asked whether it was reasonably foreseeable that the complained of harm would befall the _§ 1983_ plaintiff as a result of the defendant's conduct, and found that even if an intervening third party is the immediate trigger for the plaintiff's injury, the defendant may still be proximately liable, provided that the third party's actions were foreseeable. A person who sets in motion an adverse action can be liable for retaliation for the reasonably foreseeable consequences of his actions. A court may consider the

reasonably foreseeable consequences that would follow from a retaliatory act in considering whether the plaintiff suffered an adverse action. However, a defendant would not be held responsible for consequences unless his conduct were the proximate cause of them.

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > Immunity

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

Governments > Courts > Judicial Precedent

Torts > Public Entity Liability > Immunities > *Qualified Immunity*

*HN8*[↓] Affirmative Defenses, Immunity

A conflict in the caselaw will support an easy defense of *qualified immunity*. It is hard to imagine that any immunity threshold should hold law enforcement to a higher standard than judges when it comes to interpreting the law. The lack of any cases of controlling authority or a consensus of cases of persuasive authority on a constitutional question compels the conclusion that the law was not clearly established at the time of the incident.

**Counsel:** For STACEY ARNOLD YERKES, Plaintiff - Appellee: John C. Camillus, Plaintiff - Appellee, Law Offices, Columbus, OH; Jason Starling, Plaintiff - Appellee, Willis Spangler Starling, Hilliard, OH.

For GENE SMITH, MICHAEL KEMMER, WILLIAM STIDHAM, SCOTT WYCKHOUSE, Defendants - Appellants: Rory P. Callahan, Assistant Attorney General, Jana Minich Bosch, Amy Ruth Ita, Office of the Attorney General, Columbus, OH.

**Judges:** Before: McKEAGUE, THAPAR, and READLER, Circuit Judges.

**Opinion by:** McKEAGUE

# Opinion

**McKEAGUE, Circuit Judge.** Plaintiff-Appellee Stacey Yerkes, a former Ohio State Highway Patrol employee, claims that Defendants-Appellants Lieutenant William Stidham, Captain Michael Kemmer, Major Gene Smith, and Scott Wyckhouse caused her to be constructively discharged

from her job, due to her sex and/or sexual orientation. She brought suit against Defendants under *§ 1983* for sex *discrimination* in violation of the *Fourteenth Amendment*. Defendants appeal the district court's denial of *qualified immunity* for all four of them, alleging that their actions do not constitute a constitutional violation and that the law regarding their actions was not clearly established. [*2] Because our caselaw on this issue is conflicting, and thus the law is not clearly established, we REVERSE.

## I. Facts and Procedural History

### A. Facts

Plaintiff Stacey Arnold Yerkes worked at the Ohio State Highway Patrol from 1994 until 2018. Yerkes identifies as a gay female. The four Individual Defendants in this case—Lieutenant William Stidham, Captain Michael Kemmer, Major Gene Smith, and Scott Wyckhouse—worked with Yerkes at the Patrol. Yerkes' direct supervisor was Lieutenant Nathan Dickerson, who is not a party to this suit. Defendant Stidham was Dickerson's supervisor, Defendant Kemmer was Defendant Stidham's supervisor, and Defendant Smith was Defendant Kemmer's supervisor. Defendant Wyckhouse was one of Yerkes's coworkers. At the time of the relevant events, Yerkes worked as a Criminal Interdiction Training Sergeant, training law enforcement officers.

Yerkes alleges that beginning in 2017, Defendants targeted and criticized her for minor infractions that other officers frequently engaged in without comment. These issues included leaving her vehicle on and unattended and failing to wear her Patrol-issued hat during a traffic stop. Yerkes also alleges that—in contrast to similarly [*3] situated men in her position—she was required to perform "demeaning" tasks that did not fall within her job description. Yerkes provided evidence in the form of testimony from Dickerson that Defendants Kemmer, Stidham, and Wyckhouse made discriminatory and degrading comments about women, such as calling them slurs and questioning their merit. Dickerson also attested that slurs were used in the presence of Defendant Smith, who did not attempt to put a stop to them or to censure the speakers. Finally, Dickerson attested that Defendants Kemmer and Stidham made potentially misogynistic and homophobic comments specifically about Yerkes.

Yerkes complained about her alleged differential treatment by Defendants to Dickerson on December 6, 2017. She also complained about her perceived treatment on January 26, 2018, in a Patrol meeting attended by Defendants Kemmer and Stidham. Three days later, on January 29, 2018, she filed

a charge with the Equal Opportunity Employment Commission based on sex and sexual orientation *discrimination*.

The next day, Defendant Wyckhouse told Defendant Stidham that several of his supervisees were discussing and were upset about a tattoo on Yerkes's forearm that she **[\*4]** supposedly covered with an approved medical sleeve,[1] in a potential violation of Patrol policy.[2] Yerkes obtained the tattoo in 2017. Defendant Stidham and Defendant Wyckhouse reported the tattoo issue to Defendant Kemmer. On February 2, 2018, Defendant Kemmer called a meeting with Yerkes and requested that she take off the medical sleeve and show her tattoo (or lack thereof). When Yerkes declined to do so, Defendant Kemmer told her she was being insubordinate. Defendant Kemmer told Defendant Smith what occurred, and Defendant Smith reported the issue to the Office of Personnel.

The Office of Personnel investigated and created a report for the incident. Yerkes was charged with (1) violating the tattoo policy and (2) insubordination for declining to show Defendant Kemmer her tattoo. Captain Linek—at the time head of the Office of Personnel—and his staff[3] reviewed the report and recommended that Yerkes be terminated unless she agreed to sign a Last Chance Agreement (LCA). The LCA would have demoted her, diminished her job responsibilities, and required her to get her tattoo removed. The LCA further mandated that Yerkes waive her legal rights concerning the incident, waive her right to file **[\*5]** future EEOC charges about past activity, and withdraw her current EEOC charge.

---

[1] Defendant Stidham attests that he had already heard rumors about the tattoo in August 2017, which he discussed with Dickerson and later the Office of Personnel and his supervisor at the time, Captain Richard Meadows. Defendant Stidham alleges that Meadows told him that Dickerson, as Yerkes's direct supervisor, would follow up regarding the problem. Finally, Defendant Wyckhouse attests that he, Dickerson, and Defendant Stidham discussed the tattoo rumors again in October 2017, at which time Dickerson allegedly lied and said that he checked and that Yerkes did not have the tattoo.

[2] The policy states: "(3) All uniformed employees . . . hired prior to July 22, 2015 [such as Yerkes], with tattoos, brandings, or body art that are visible in any class of uniform shall not be required to remove the existing tattoo, branding, or body art but shall not add to, modify, enhance or receive additional tattoos, brandings, or body art. . . . (4) Tattoos, brandings, or body art will be covered by any employee while representing the Division and not in uniform at any event or meeting, i.e., speech details, court appearances, public events, etc." R. 104-6 at PID 6362.

[3] Captain Linek also attested that supervisors are consulted regarding their subordinates' discipline as a "matter of course," and that he did in fact consult with Defendant Kemmer regarding Yerkes's discipline. R. 86, PID 3809-11, 3881-82, 3923-24.

The disciplinary decision was approved by John Born, Director of the Department of Public Safety. On February 12, 2018, Yerkes chose to retire instead of accepting the LCA or being terminated and having her file marked with a "not in good standing" designation. Her successor was a male.

Because Yerkes wore an allegedly approved medical sleeve that covered the tattoo, there is a factual dispute as to whether Yerkes' tattoo violates the policy. There is also a factual dispute as to whether the tattoo in combination with the supposed insubordination would normally constitute a fireable offense. Yerkes alleges that multiple other troopers—males—had tattoos in violation of the policy but were never reported or disciplined for them. Defendants allege that some other troopers did face discipline for their tattoos. The Patrol's Rule 30(b)(6) deponent admitted that the Patrol relied on supervisors to report infractions of the tattoo policy, and that "but for" supervisors investigating and reporting an officer's tattoo violation, that officer would never be disciplined. R. 104 at PID 6036-37.

## B. Procedural History

On May 20, 2019, **[\*6]** Yerkes filed this action in the Southern District of Ohio against the Individual Defendants as well as the Patrol. She sued the Individual Defendants under *42 U.S.C. § 1983* for violating her constitutional right to Equal Protection by discriminating against her on the basis of her sex and sexual orientation. She sued the Patrol alleging that the Patrol discriminated and retaliated against her based on her sex and sexual orientation in violation of Title VII of the Civil Rights Act of 1964. The Individual Defendants filed a motion to dismiss, which the district court denied. Discovery proceeded, and then all Defendants moved for summary judgment, with the Individual Defendants additionally moving for summary judgment on *qualified immunity* grounds.

On December 30, 2021, the district court denied summary judgment on all claims and denied the Individual Defendants *qualified immunity*. The district court concluded that Yerkes's Title VII and *§ 1983* claims were sufficient to survive summary judgment. Using the *McDonnell Douglas* burden-shifting framework, *see McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*, the district court determined that Yerkes suffered an adverse employment action in the form of constructive discharge, and that she had provided sufficient evidence for a jury to find that the Patrol's reasons for **[\*7]** the constructive discharge (her tattoo and insubordination) were pretextual. In determining whether either the Patrol or the Individual Defendants could be held liable where the final decisionmaker

2022 U.S. App. LEXIS 35260, *7

regarding the adverse employment action (Colonel Born) was not alleged to have demonstrated any bias, the district court referenced the "cat's paw" theory of liability, whereby "if a supervisor performs an act motivated by [discriminatory] animus that is intended by the supervisor to cause an adverse employment action, and that if that act is a proximate cause of the ultimate employment action, then the employer is liable." R. 112 at PID7258-59 (quoting *Staub v. Proctor Hosp., 562 U.S. 411, 422, 131 S. Ct. 1186, 179 L. Ed. 2d 144 (2011)*). The district court's determinations regarding the Patrol are not the subject of this appeal.

Finally, the district court denied ***qualified immunity***. The court noted that Yerkes alleged that "the Individual Defendants forced [Yerkes] into retirement," and stated that "there is clearly established law protecting female employees from arbitrary ***discrimination*** based on sex or sexual orientation for *§ 1983* purposes." *Id.* at 7253. The Individual Defendants appealed the denial of ***qualified immunity***.

## II. Jurisdiction

Plaintiff alleges that this Court does **[*8]** not have jurisdiction over this appeal, contending that Defendants are making a fact-based challenge inappropriate for interlocutory review. *HN1*[↑] We have jurisdiction to review on interlocutory appeal a district court's denial of ***qualified immunity***. *See 28 U.S.C. § 1291; Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985)*. However, this review is restricted: we can consider "only purely legal questions." *McGrew v. Duncan, 937 F.3d 664, 669 (6th Cir. 2019)*. We cannot review disputed facts at this stage, or even exercise jurisdiction "where the issue of ***qualified immunity*** turns on contested issues of fact." *Alspaugh v. McConnell, 643 F.3d 162, 168 (6th Cir. 2011)*. "[I]f the facts are disputed, as they often are, the court must presume the plaintiff's version of the facts." *Grawey v. Drury, 567 F.3d 302, 310 (6th Cir. 2009)*. If an appeal challenges solely a district court's "determination of evidence sufficiency, i.e., which facts a party may, or may not, be able to prove at trial," then it must be dismissed. *DiLuzio v. Vill. of Yorkville, 796 F.3d 604, 609 (6th Cir. 2015)* (quoting *Johnson v. Jones, 515 U.S. 304, 313, 115 S. Ct. 2151, 132 L. Ed. 2d 238, (1995)*) (internal quotation marks omitted).

There are only two exceptions to this rule. First, we may review appeals where the defendant, "despite disputing a plaintiff's version of the story," concedes "the most favorable view of the facts to the plaintiff for purposes of the appeal." *Gillispie v. Miami Twp., Ohio, 18 F.4th 909, 916 (6th Cir. 2021)* (quoting *Adams v. Blount Cnty., Tennessee, 946 F.3d 940, 948 (6th Cir. 2020)*). Second, in the "exceptional" case,

we may review a challenge to the district court's factual determination **[*9]** "if that determination is 'blatantly contradicted by the record, so that no reasonable jury could believe it.'" *Adams, 946 F.3d at 948* (quoting *Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007)*).

*HN2*[↑] However, even if a defendant in a partially fact-based appeal fails to meet either of these exceptions, we may separate the legal issues from the factual—i.e., we can "still review 'pure question[s] of law, despite the defendants' failure to concede the plaintiff's version of the facts[.]" *Adams, 946 F.3d at 948* (quoting *Livermore ex rel. Rohm v. Lubelan, 476 F.3d 397, 403 (6th Cir. 2007)*). In the course of this review, we put aside the defendant's factual challenges and answer the purely legal questions, instead of dismissing for lack of jurisdiction. *See id.*

Defendants appear to challenge factual determinations and inferences in their appeal. They continually argue that Yerkes' tattoo violated Patrol policy, despite the district court noting that there was a genuine dispute as to that issue. Further, Defendants' brief frequently speaks in sufficiency-of-the-evidence terms, using phrases such as "factual ability" and "no evidence." *See, e.g.*, Appellants' Br. at 6, 25, 30. And the exceptions to fact-based appeals do not apply in this case. Defendants do not concede the most favorable view of the facts to Yerkes. In addition, beyond reciting the standard, **[*10]** Defendants make no substantive attempt to argue that the district court's factual determinations "blatantly contradicted" the record. *See Barry v. O'Grady, 895 F.3d 440, 444 (6th Cir. 2018)* ("[Defendant] does not explain why any of the district court's conclusions were blatantly and demonstrably false; he merely disagrees with them.").

However, it is possible and indeed simple in this case to wall off any factual disputes and answer the legal question at the core of Defendants' appeal: namely, whether their actions—under the facts taken in the light most favorable to Yerkes—constitute a clearly established constitutional violation. Much of the Defendants' fact-based arguments revolve around their ability to influence (rather than be a but-for cause of) the decision that was made regarding Yerkes's employment—an issue which the district court did not discuss in any detail. *HN3*[↑] We may exercise jurisdiction by ignoring Defendants' factual challenges, taking the facts in the record in the light most favorable to Yerkes, and focusing on the purely legal issue at hand. *See, e.g.*, *Livermore, 476 F.3d at 403* ("We therefore conclude that this court has jurisdiction over defendants' interlocutory appeal to consider whether, accepting the facts as alleged by [the plaintiff], **[*11]** defendants are entitled to ***qualified immunity***. . . ."); *cf. DeCrane v. Eckart, 12 F.4th 586, 603 (6th Cir. 2021)*

("[L]egal arguments about the proper meaning of the *First Amendment's* causation element would fall within our jurisdiction if raised in a **qualified-immunity** defense."). Thus, this Court has jurisdiction to hear this appeal, though we are careful to address only legal issues.

### III. *Qualified Immunity*

*HN4*[↑] We review de novo a district court's denial of summary judgment regarding **qualified immunity**. *See Brown v. Chapman, 814 F.3d 436, 444 (6th Cir. 2016)*. **Qualified immunity** shields government officials from liability for damages for actions that do "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Watson v. Pearson, 928 F.3d 507, 510 (6th Cir. 2019)* (quoting *Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)*). Thus, to defeat **qualified immunity**, a plaintiff must allege: (1) that the defendant violated a statutory or constitutional right and (2) that said right was clearly established at the time of the alleged violation. *See id.* A right is clearly established where "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Cahoo v. SAS Analytics Inc., 912 F.3d 887, 898 (6th Cir. 2019)* (quoting *Baynes v. Cleland, 799 F.3d 600, 610 (6th Cir. 2015)*).

*HN5*[↑] In order to properly make out a claim under *§ 1983*, a plaintiff must demonstrate that she has been deprived, by one acting under color of state law, of a right secured [*12] by the Constitution or Federal laws. *See 42 U.S.C. § 1983*; *Day v. Wayne Cnty. Bd. of Auditors, 749 F.2d 1199, 1202 (6th Cir. 1984)*. In general, the Sixth Circuit reviews constitutional *discrimination* claims alleging violation of Equal Protection under *§ 1983* in a similar manner as Title VII *discrimination* claims, and looks at Title VII precedent in analyzing *§ 1983* *discrimination* claims. *See, e.g., Weberg v. Franks, 229 F. 3d 514, 522 (6th Cir. 2000)*. In a *§ 1983 discrimination* case, the plaintiff must prove that "the employer made an adverse employment decision 'with a discriminatory intent and purpose.'" *Boger v. Wayne County, 950 F.2d 316, 324-25 (6th Cir. 1991)* (quoting *Charles v. Baesler, 910 F.2d 1349, 1356-57 (6th Cir. 1990)*).

Yerkes alleges that Defendants caused her to be constructively discharged from her employment with the Patrol due to her sex and sexual orientation, by reporting her tattoo (Defendant Wyckhouse) and/or escalating the report (Defendants Kemmer, Stidham, and Smith). The district court concluded that Yerkes had been constructively discharged, which constituted an adverse employment action. The district court also determined that there was a sufficient dispute of material fact regarding whether Defendants were biased

against Yerkes due to her sex and/or sexual orientation and whether they intentionally reported her for the potential tattoo policy violation due to that bias. The district court further held that despite the fact that [*13] the final decisionmakers were not demonstrated to be biased, Yerkes could "proceed against the Individual Defendants under a cat's paw theory of liability," as "[a] reasonable juror could find that the Plaintiff would not have been fired or disciplined if the Individual Defendants had not reported her and investigated her tattoo." R. 112 at PID 7259.[4] Regarding **qualified immunity** specifically, the district court determined that "discriminating against Plaintiff because of her sex and sexual orientation is a violation of the *Fourteenth Amendment*," and that "there is clearly established law protecting female employees from arbitrary *discrimination* based on sex or sexual orientation for *§ 1983* purposes so that Defendants were 'on notice that their conduct was unlawful.'" *Id.* at 7253.

Defendants do not appear to challenge this statement, but rather allege that the district court "framed the [**qualified immunity**] question incorrectly." Appellants' Br. at 3-4. Defendants also do not appear to challenge the determination that Yerkes was constructively discharged, or the determination regarding the evidence of their alleged bias.[5] Defendants challenge only whether they can be held liable for reporting [*14] (and escalating the report regarding) Yerkes' policy violation where allegedly: (1) they did not have the decision-making power to constructively discharge Yerkes, (2) they did not recommend the discipline that Yerkes eventually received, and (3) Yerkes provided no evidence that the final decisionmakers regarding her discipline acted based on her sex or sexual orientation.

The district court's **qualified immunity** analysis contoured the right in question at too high a level of generality. *See Godawa v. Byrd, 798 F.3d 457, 467 (6th Cir. 2015)HN6*[↑] ("The Supreme Court has 'repeatedly told courts not to define

---

[4] Yerkes argues that the District Court did not use the cat's paw theory of liability to find the Individual Defendants potentially liable for her constructive discharge, but rather only used it to hold the Patrol liable under Title VII. The district court's opinion is a bit vague and confusing on this point, but it does explicitly say that Yerkes could "proceed against the *Individual Defendants* under a cat's paw theory of liability." R. 112 at PID 7259 (emphasis added). The district court seemingly applied the cat's paw theory in the traditional sense to impute the Individual Defendants' alleged bias to the patrol, as well as in reverse to hold the Individual Defendants liable for the non-biased actions of the higher-ups.

[5] Nor can they challenge this fact-based conclusion on this limited appeal. *See, e.g., DiLuzio v. Vill. of Yorkville, 796 F.3d 604, 609 (6th Cir. 2015)*.

clearly established law at a high level of generality.'" (quoting *Plumhoff v. Rickard, 572 U.S. 765, 779, 134 S. Ct. 2012, 188 L. Ed. 2d 1056, (2014)*)). The pertinent question is not whether the law banning **discrimination** on the basis of sex is clearly established, but a more nuanced one: whether reporting a potential policy violation up the chain of command with the intent to cause a fellow officer to lose their job, due to that officer's sex and/or sexual orientation, constitutes a clearly established constitutional violation. As our caselaw on this issue has gone in conflicting directions, we find that the answer to that question is no.

There are many cases in the Sixth Circuit which state/hold that an officer **[*15]** may be held liable under *§ 1983* for a constitutional violation even if he did not himself perform a particular action necessary to that violation. *See, e.g.*, *Harris v. Bornhorst, 513 F.3d 503, 518-19 (6th Cir. 2008)* (Prosecutor may be held liable for retaliation where she made statements to the Marine Corps leading the Corps to deny the plaintiff's application); *Paige v. Coyner, 614 F.3d 273, 281-82 (6th Cir. 2010)* (Official may be held liable for retaliation where she gave false information to the plaintiff's employer, causing the plaintiff to be terminated from her position); *King v. Zamiara, 680 F.3d 686, 697-98, 702-03 (6th Cir. 2012)* (Prison guards may be held liable for retaliation where they set in motion a chain of events leading to the plaintiff's change in security status); *Sykes v. Anderson, 625 F.3d 294, 311-316 (6th Cir. 2010)* (Police officers may be held liable for malicious prosecution where evidence demonstrated that they influenced/participated in the decision to prosecute the plaintiffs, though they did not make the final decision themselves); *Paterek v. Vill. of Armada, 801 F.3d 630, 651 (6th Cir. 2015)* (Official may be held liable for retaliation where he directed another official to commit adverse action against the plaintiffs); *Siggers-El v. Barlow, 412 F.3d 693, 701 (6th Cir. 2005)* (Prison guard may be liable for retaliation where he initiated a security screen of the plaintiff, even though another official had to approve the transfer); *Powers v. Hamilton Cnty. Pub. Defender Comm'n, 501 F.3d 592, 609 (6th Cir. 2007)* (Public Defender office could be held liable for violating the plaintiff's **[*16]** constitutional rights where Defender's "silence about [the plaintiff's] asserted indigency made it reasonably foreseeable that he would be jailed for non-payment of his fine without having received an indigency hearing").

*HN7*[↑] These cases appear to be merely specific applications of the long-accepted proposition that "[s]ection [*1983*] should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." *Monroe v. Pape, 365 U.S. 167, 187, 81 S. Ct. 473, 5 L. Ed. 2d 492 (1961)*; *see also Powers, 501 F.3d at 608* ("Traditional tort concepts of causation inform the causation

inquiry on a *§ 1983* claim."). Thus, courts have long asked "whether it was reasonably foreseeable that the complained of harm would befall the *§ 1983* plaintiff as a result of the defendant's conduct," and found that "[e]ven if an intervening third party is the immediate trigger for the plaintiff's injury, the defendant may still be proximately liable, provided that the third party's actions were foreseeable." *Powers, 501 F.3d at 609*; *see also King, 680 F.3d at 695* ("[A] person who sets in motion an adverse action can be liable for retaliation for the reasonably foreseeable consequences of his actions."); *Siggers-El, 412 F.3d at 702* ("[A] court may consider the reasonably foreseeable consequences that would follow from a retaliatory act in **[*17]** considering whether the plaintiff suffered an adverse action. However, a defendant would not be held responsible for consequences unless his conduct were the proximate cause of them.").

Under this theory, when Defendants reported Yerkes' potential tattoo policy violation and/or escalated said report, it was a reasonably foreseeable consequence that she could face an adverse employment action such as constructive discharge. Such a result is the natural consequence of reporting a policy violation to upper management. Defendants—taking the facts in the light most favorable to Yerkes, as we must—set in motion a chain of events that foreseeably culminated in Yerkes' constructive discharge, with discriminatory intent. *See, e.g.*, *King, 680 F.3d at 697-98* (finding that defendant prison guard can be held liable for retaliation where she sent a letter to her superior complaining about plaintiff inmate, eventually leading to the prison increasing the inmate's security level); *Siggers-El, 412 F.3d at 701* (finding that defendant prison guard may be held liable for retaliation where he initiated a security screen of the Plaintiff, even though another official had to approve the transfer, concluding that "the Defendant's performance of the security **[*18]** screen of the Plaintiff set in motion Plaintiff's transfer").[6]

_____

[6] The district court referenced the "cat's paw" theory, R. 112 at PID 7258-59, which Defendants argue is inapplicable to this case. The theory states: "[I]f a supervisor performs an act motivated by . . . animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable. . . ." *Staub v. Proctor Hosp., 562 U.S. 411, 422, 131 S. Ct. 1186, 179 L. Ed. 2d 144 (2011)*. This appeal would involve twisting the cat's paw theory around, as Yerkes is not attempting to hold the Patrol liable via the discriminatory intent of the Individual Defendants, but rather to hold the Individual Defendants liable via the adverse action of the Patrol. Some Sixth Circuit cases have applied the cat's paw theory in this non-traditional manner, including in *§ 1983* cases. *See DeNoma v. Hamilton Cnty. Ct. of Common Pleas, 626 F. App'x 101 (6th Cir. 2015)* (Title VII); *Paterek v. Vill. of Armada, 801 F.3d 630 (6th Cir.*

However, none of these cases are directly on point, and most are *First Amendment* retaliation cases. The *First Amendment* retaliation standard incorporates a causation requirement, *see, e.g., Paige, 614 F.3d at 281*, unlike the **discrimination** standard, so the proximate cause analysis in retaliation cases doesn't clearly apply here. Further, there are numerous cases in this circuit—also *First Amendment* retaliation cases—that seem to contradict the notion that individuals who are not final decisionmakers can be held liable for the actions of the final decisionmaker, even in the retaliation context. *See Fritz v. Charter Twp. of Comstock, 463 F. App'x 493, 500 (6th Cir. 2012)* (no liability where defendant "was not in a position to terminate Plaintiff . . . and lacked authority to take adverse action against her"); *Poppy v. City of Willoughby Hills, 96 F. App'x 292, 294-95 (6th Cir. 2004)* ("Because [defendant] was not the decisionmaker, he cannot be held liable under *§ 1983* for the City Council's decisions regarding [the plaintiff's] terms and conditions of employment."); *Echlin v. Boland, 111 F. App'x 415, 417 (6th Cir. 2004)* ("The motivations of non-decisionmakers cannot establish a causal connection in a retaliation case."); *Smith v. Campbell, 250 F.3d 1032, 1038 (6th Cir. 2001)* ("[The defendant's] comments do not demonstrate a causal connection between [the plaintiff's] filing of grievances and the [adverse action] because it is uncontroverted **[*19]** that she was not the decisionmaker in this case."); *Shehee v. Luttrell, 199 F.3d 295, 301 (6th Cir. 1999)* ("The defect in [the plaintiff's] claim is that neither [of the defendants] were involved in his firing, the alleged adverse action. Despite [the plaintiff's] contention that [the defendants] instigated his firing, these men did not have the ability to terminate [the plaintiff] from his commissary position.").

*Shehee* is the closest published case to this one. In that case, the plaintiff was a prisoner who worked in the commissary. *199 F.3d at 297-98.* He alleged that he was harassed by his direct supervisors after refusing to participate in their kickback scheme. *Id.* He then allegedly filed a grievance against his supervisors, and was subsequently terminated from his position by upper management due to the conflict. *Id.* This Court held that his direct supervisors could not be held liable for retaliation, as, "[d]espite [plaintiff's] contention that [the supervisors] instigated his firing, these men did not have the ability to terminate [plaintiff] from his commissary position." *Id. at 301.* The logic and language of *Shehee* directly contradicts the "setting in motion" theory described above.

These cases muddy the waters. The confusion in the caselaw, and the lack of any case **[*20]** directly on point, makes it difficult to conclude that "existing precedent . . . place[s] the statutory or constitutional question beyond debate." *White v. Pauly, 580 U.S. 73, 137 S. Ct. 548, 551, 196 L. Ed. 2d 463 (2017); see also Melton v. Phillips, 875 F.3d 256, 268 (5th Cir. 2017)* (Costa, J., concurring in judgment) *HN8*[ ] ("Such a conflict in the caselaw will support an easy defense of **qualified immunity**. . . . [I]t is hard to imagine that any immunity threshold should hold law enforcement to a higher standard than judges when it comes to interpreting the law."); *Jessop v. City of Fresno, 936 F.3d 937, 942 (9th Cir. 2019)* ("The lack of 'any cases of controlling authority' or a 'consensus of cases of persuasive authority' on the constitutional question compels the conclusion that the law was not clearly established at the time of the incident." (quoting *Wilson v. Layne, 526 U.S. 603, 617, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999)*); *Mitchell v. Schlabach, 864 F.3d 416, 424 (6th Cir. 2017)* (concluding that a right was not clearly established as "none of [the] cases [cited by this case] is sufficiently 'particularized' to the facts of this case to place the supposed unconstitutionality of [the defendant's] action 'beyond debate'" (citation omitted)). Thus, the law on this issue was not clearly established, and all four Defendants are entitled to **qualified immunity**.[7]

## IV. Conclusion

The judgment of the district court denying **qualified immunity** to Defendants Kemmer, Stidham, Smith, and Wyckhouse is **[*21]** REVERSED.

---

**End of Document**

---

*2015).* But we have never explicitly adopted the reverse cat's paw theory, and the cat's paw theory—especially when used in reverse—is at its core just an application of the tort causation principles described above. Whether one terms it "reverse cat's paw" or simply "proximate causation," the results are the same, and the nomenclature is just semantics.

---

[7] Because we conclude that the law was not clearly established, we decline to analyze whether Defendants' actions constitute a constitutional violation, as we may under *Pearson v. Callahan, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).* And because we reverse the district court and grant **qualified immunity** to Defendants, we decline to address their argument that the district court improperly aggregated their actions.

Heidi Rosales